UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| BONNIE KOHLERITER and LAURA LEIGH,<br><br>　　　　　　　　　　Plaintiffs,<br>　v.<br>SALLY JEWELL, et al.,<br>　　　　　　　　　　Defendants. | Case No. 3:13-cv-00495-MMD-VPC<br><br>ORDER |

## I.　INTRODUCTION

This Order addresses the remaining issue raised in Plaintiffs' Emergency Motion for Temporary Restraining Order (dkt. no. 5). In their Motion, Plaintiffs request a temporary restraining order to prevent Defendants from infringing on their First Amendment rights to meaningful access to view Sheldon horses held in Virgin Valley temporary holding facilities. Based on the briefing and evidentiary hearing, this Court holds that Plaintiffs are not likely to succeed on the merits of their claim and accordingly denies their request for emergency temporary relief.

## II.　BACKGROUND

Plaintiffs Bonnie Kohleriter and Laura Leigh initiated this action on September 13, 2013, concerning the United States Fish and Wildlife Service's ("FWS") September 9-14, 2013, round-up of feral horses at the Sheldon Refuge. The First Amended Complaint alleges claims under the Administrative Procedure Act ("APA") (first claim for relief) and the First Amendment (second claim for relief) and a third claim for declaratory relief.

(Dkt. no. 3.) On September 17, 2013, Plaintiffs filed their Emergency Motion in which they assert two claims for emergency relief: (1) that sending captured horses to J&S Associates, Inc. ("J&S"), an adoption contractor, violates the APA; and (2) that the Sheldon gather and holding procedures violate Plaintiffs' First Amendment rights. (Dkt. no. 5.) The Court held a hearing on the Emergency Motion on Friday, September 27, 2013. (Dkt. no. 14.)

At the hearing, the Court denied Plaintiffs' request for emergency relief with regard to Plaintiffs' APA claim. The Court found that Plaintiffs had not demonstrated a likelihood of success on the merits. (Dkt no. 20.) The Court allowed the parties to file supplemental briefing on Plaintiffs' APA claim and, after reviewing the briefing, declined to reconsider its order. (Dkt. no. 27.)

Concerning Plaintiffs' First Amendment claim, the Court found that the First Amendment claim relating to the gathering of Sheldon horses was moot for the purpose of emergency relief as the gather had already been completed and it is undisputed that no other gather is scheduled to occur at the Sheldon Refuge until 2014. (Dkt. no. 13 at 3.) The Court found that Plaintiffs' First Amendment claim regarding Plaintiffs' viewing access to the captured horses, some of which are scheduled to remain at the Virgin Valley temporary holding facilities throughout October (dkt. no. 13 at 13–14), is ripe for review, and required the Court to hear evidence on the factors established in *Press-Enterprise Co. v. Superior Court of California for Riverside* (*Press-Enterprise II*), 478 U.S. 1 (1986). The Court held an evidentiary hearing on October 10, 2013, in which both parties had the opportunity to present evidence on each of the *Press-Enterprise II* factors.

### III. LEGAL STANDARD

#### A. Temporary Restraining Order

Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary restraining orders, and requires that a motion for temporary restraining order include "specific facts in an affidavit or a verified complaint [that] clearly show that immediate

and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," as well as written certification from the movant's attorney stating "any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

Temporary restraining orders are governed by the same standard applicable to preliminary injunctions. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F. 3d 832 n.7 (9th Cir. 2001). Further, a temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974).

A temporary restraining order may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

### B. Applicable Law

*Press-Enterprise II* provides the test for determining whether there is a qualified First Amendment right of access for the press and public to observe governmental activity and whether that right was infringed upon. *See Leigh v. Salazar*, 677 F.3d 892, 899-900 (9th Cir. 2012). In step one, the court must employ a two-part "experience" and "logic" test in order to determine if there is a qualified right. *Press-Enterprise II*, 478 U.S. at 1, 8-9; *see also U.S. v. Guerrero*, 693 F.3d 990, 1000 (9th Cir. 2012). The court asks

(1) "whether the place and process have historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 1, 8–9. The government may overcome the qualified First Amendment right established in prong one of the *Press-Enterprise II* test by demonstrating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 9.

## IV. DISCUSSION

### A. Qualified Right: Experience Requirement

The experience prong of the First Amendment test considers whether "the place and process have historically been open to the press and the general public." *Id.* at 8. The requirement "does not look to the particular practice of any one jurisdiction, but instead 'to the experience in that *type* or *kind* of hearing throughout the United States.'" *El Vocero de P.R. v. Puerto Rico*, 508 U.S. 147, 150 (1993) (per curiam) (quoting *Rivera-Puig v. Garcia-Rosario*, 983 F.2d 311, 323 (1st Cir. 1992)).

The Court initially notes that this is not a case in which Defendants have failed to provide any access. The parties agree that the public is not wholly prohibited from viewing the holding facilities. The public can view the facilities from: (1) a public access road (Virgin Valley Road); and (2) an adjacent rock dyke.[1] Defendants' witness John Kasbohm testified that the closest viewing point from these public areas to the holding facilities is approximately 500 feet. Defendants have represented to the Court that in addition to the viewing areas, they have attempted to provide further access through a one-time two-hour guided tour of the holding facilities. The guided tour was canceled due to the lapse in appropriations, but Defendants stated that if appropriations were to

---

[1] While Plaintiffs do not characterize their ability to use the access road and adjacent dyke as "access," they acknowledge that the two areas are available for all members of the public to use, including those interested in viewing the horse holding facilities.

be restored, as they have been, the guided tour would be rescheduled.[2] Given these viewing opportunities, the question is not whether historical access to holding facilities has been provided at wildlife refuges, but whether more proximate access has been given.

Plaintiffs submitted testimonies at the evidentiary hearing aimed at demonstrating that: (1) the Sheldon Refuge has historically provided greater access to horse holding facilities than is currently being offered; and (2) wildlife refuges in other parts of the country provide the public with greater access to horse holding facilities than is currently available at Sheldon. However, Plaintiffs have failed to show that greater access to horse holding facilities has been provided historically at either Sheldon Refuge or other national wildlife refuges.

### 1. Experience at the Sheldon Refuge

Plaintiffs introduced evidence intended to demonstrate that the Sheldon Refuge has allowed greater public access in the past and that the current regulations are uniquely restrictive. Plaintiffs presented testimonies from three witnesses concerning Sheldon's historical access: Lesley Neuman, Marla Jo Bennett, and Kathryn Pickett. While each witness provided testimony demonstrating that some members of the public had been given more proximate access from 2001-2006, this access appears to have been reserved for: (1) volunteers who signed volunteer agreements; and (2) individuals interested in adopting horses.

Marla Jo Bennett, a former employee of FWS who worked at the Sheldon Refuge as a Refuge Operations Specialist from 2001-2006, testified that volunteers signed agreements with FWS and were at the Sheldon Refuge in order to contribute their horse expertise to the FWS gather activities. Leslie Neuman was a volunteer at the Sheldon Refuge in October 2004 and August 2005, a fact that was demonstrated by her

---

[2] The Court fully expects that given the government's restoration of appropriations, Defendants will immediately reschedule the guided tour.

testimony that she believes she signed a volunteer agreement and that she was at the Sheldon Refuge in order to "help out." Kathryn Pickett was also a volunteer at the Sheldon Refuge in August 2005 and she testified that she was there helping the veterinarian. The testimony of both Ms. Neuman and Ms. Pickett was focused on the access to horses given to volunteers, not general members of the public or press. Volunteers who have signed volunteer agreements with the federal government are certainly distinguishable from interested members of the public and members of the press at issue in this case.

Plaintiffs' witnesses also testified that individuals interested in adopting Sheldon horses were given privileged access. At the time of Ms. Bennett's employment at the Sheldon Refuge, FWS was responsible for finding each gathered horse an adoptive home. In order to do so, it was necessary to show potential adopters the horses. That practice has changed. FSW now sends horses to adoption contractors who handle the individual adoptions and, therefore, individual adopters are no longer a priority for Sheldon staff. Ms. Bennett testified explicitly that potential adopters are distinguishable from members of the general public or press. When asked if FWS restricted the access given to members of the public, Ms. Bennett stated: "I mean, there were restrictions. The general public could not just wander back there. But if they were thinking of adopting and had an appointment, we could always show them back there."[3]

None of Plaintiffs' witnesses testified that the Sheldon Refuge has ever had a policy of allowing the public viewing access that was superior to what is currently provided. Indeed, several of Plaintiffs' witnesses testified that there has been a curtain of secrecy surrounding Sheldon. Ms. Leigh testified that Sheldon has completely precluded the public since 2006. Ms. Bennett testified that in her experience from 2001-2006, FSW

---

[3] Ms. Bennett also indicated in her testimony that general members of the public may have been proximate to captured horses on a few occasions in the past. While the testimony is ambiguous on this point, evidence that members of the public happen to have had such access occasionally in the past does not establish that the refuge has been historically open.

"never wanted the public to have access. They wanted it all hidden." Terri Farley, an author of fact-based fiction about wild horses, testified that the Sheldon Refuge is "behind the curtain." She stated that "[t]here is this iron curtain out there . . . . there are very few photographs, even, of the horses out at Sheldon." Ms. Farley continued that during the nineties she was invited to Sheldon by a BLM employee but that the invitation was then retracted. Ms. Farley concluded that preclusion of the public "is not brand-new. I am under the impression it's gotten worse" but that "[a]ll we're getting out of Sheldon is hearsay." Defendants' witness John Kasbohm, the Project Leader for Sheldon Refuge, also testified that the public has never been given access to the administrative facilities at Sheldon, although he also admits that he lacks personal knowledge about access permitted before 2011.

Plaintiffs therefore have failed to demonstrate that Sheldon has historically provided greater access to the press and public to view captured horses in holding facilities than the current access offered by Defendants.

### 2. Experience at Other National Wildlife Refuges

In the absence of evidence that the Sheldon Refuge has historically provided greater access to its horse holding facilities than it is currently, Plaintiffs may fulfill the experience prong of *Press-Enterprise II* by demonstrating access to holding areas on other national wildlife refuges. *See El Vocero de P.R.*, 508 U.S. at 150.

Plaintiffs' only testimony regarding other wildlife refuges was from Ms. Leigh and Ms. Farley. Ms. Leigh testified that she maintains a database called "Keep Them in the Wild" that catalogues horses on national wildlife refuges across the United States. Ms. Leigh testified that in compiling the database she has examined photos on a Corolla horse website. She explained that the website's photos were taken exclusively by members of the public. She did not provide any details concerning the proximity of the photographers to the horses, the timeframe within which the photographs were taken, who created the website, or who specifically took the photographs. Ms. Leigh's statement that the public has had access to Corolla horses cannot alone establish that

other wildlife refuges provide the access Plaintiffs seek in this case. Nor does Ms. Farley's testimony support Plaintiffs' claim that other national wildlife refuges provide greater public access to captured horses in their holding facilities. Ms. Farley testified as to her experiences at other wildlife refuges, but she admitted that she has not had access to temporary holding facilities to view captured horses during or after a horse gather. Plaintiffs' evidence of historical access at other wildlife refuges fails to satisfy the experience prong.

Based on the evidence presented, the Court finds that Plaintiffs cannot demonstrate that they have a qualified right of access under *Press-Enterprise II*. The Court thus concludes that Plaintiffs cannot demonstrate the likelihood of success on their First Amendment claim upon which they base to seek emergency temporary relief for greater access to the Virgin Valley temporary holding facilities.

## V.  CONCLUSION

Plaintiffs have not demonstrated that they are likely to succeed on their claim that they have a qualified First Amendment right to greater access to view the holding facilities at Sheldon Refuge. In order to establish likelihood of a qualified right, Plaintiffs must show that the place and process have historically been open to the press and general public and that such access plays a positive role in the process' functioning.[4] Plaintiffs have not shown that, historically, members of the general public have been given greater viewing access than has been provided to Plaintiffs. The Court therefore

///

///

///

///

///

---

[4] The Court notes that Plaintiffs presented extensive testimony concerning the public's positive role in horse gather activities on FWS land. The Court agrees that public access to the holding facilities is important to the function of the gather.

does not find likelihood of success on the merits.[5] Plaintiffs' Emergency Motion (dkt. no. 5) is denied.

ENTERED THIS 18th day of October 2013.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

[5] As the Court noted at its hearings on September 27, 2013, and October 10, 2013, the Court has serious concerns about whether the government's measures are indeed narrowly tailored. The viewing areas provided to the general public and press appear to have been chosen merely for the government's convenience as they were areas already made open to the public. However, as Plaintiffs have failed to establish likelihood of success on their claim that they have a qualified right, the Court will not consider, at this stage, whether Defendants' restrictions were narrowly tailored to a legitimate government interest.